3230369 Kevin Haas individually and as parent and next friend of Riley Haas, a minor, Appellants v. Kankakee School District 111 and Darren Wilbur Dayoff, Appellees. Mr. Anderson, you may proceed. Thank you. May it please the Court's Council, my name is Pat Anderson. I represent the plaintiff appellants Kevin Haas and Riley Haas. We're asking the Court to reverse the decision of the trial court to grant summary judgment in defendant's favor based on section 2-201 of the Tort Immunity Act. Understanding the limitations and I invite any questions that you might have, but I hope to address three main areas in the time allowed here. First, statutory immunity for discretionary conduct under section 2-201 is not applicable because some level of conscious decision making is a legal condition precedent for invocation of discretionary immunity. Here we have a teacher that's completely checked out, essentially sitting in the corner with his feet up looking at devices and was unaware of the danger that caused the plaintiff's injury. So there's no evidence of conscious decision making and therefore it cannot be said that his failure to intervene was the product of any considered choice. The second area I'd like to discuss is that there's a more specific section 3-108 which pertains to supervision which is the specific conducted issue in this case because section 3-108 is specific and section 2-201 is general. 3-108 applies even if there were evidence of a conscious decision which there isn't. That leads me to the third area that I want to discuss today because section 3-108 does not contain an immunity for willful and wanton conduct unlike section 2-201. It does not immunize willful and wanton conduct and whether Mr. Dayhoff's conduct in this case, the teacher, his conduct was willful and wanton is a question of fact. Included in the definition of willful and wanton conduct under Illinois law is utter indifference for the safety of others. This case may be the strongest example of what utter indifference actually is. We have a situation where the gym teacher abrogated his duty to supervise entirely and instead sat in the corner of the gym with his feet up doing screen time. So at the very least the issue of willful and wanton conduct should be decided by a jury. Now this is a wrong... Is there evidence that he saw this going on in that interview? No, that's the fatal flaw in their argument and that's the admission that necessarily precludes application of discretionary immunity. He testified that he didn't see any of the behavior that the other students testified was occurring throughout class. He testified he did not see any aggressive behavior from student eight and so he did not see any aggressive behavior. His failure to intervene to stop that aggressive behavior wasn't a considered choice. It was a decision by default. So he can't be said to have made a decision with respect to something he didn't know about. So the evidence is that he... It was his regular custom and practice to sit in the corner of the gym using his phone and computer throughout class and would sit with his feet up in his desk. The evidence is that he would use the computer and the devices anytime it wasn't the first and over at him during class that day. That's what he was doing. The evidence is that he was following that custom and practice. So that gives rise to the inference that he simply wasn't paying attention. If he doesn't know about the danger that he was supposed to intercede to stop, he couldn't have made a decision to stop it. When we're talking about Section 201 immunity, it's important to also keep in mind that the act is in derogation of common law. So it must be strictly against the entity seeking immunity. We also must remember that it's a municipal defendant's burden to establish that it's entitled to immunity. So if they can't prove that there was a decision, then immunity doesn't apply. A municipal defendant is not entitled to judgment as a matter of law when a question of fact exists as to whether the conduct was a policy decision or discretionary. So even if it's a question as to whether this was a discretionary decision, summary judgment is not appropriate. Our Supreme Court in both Monson and Andrews addressed this issue and held specifically that for a local public entity to avail itself of Section 2-201 immunity, particularly at the summary judgment stage, they must offer unrefuted evidence that it made a conscious decision not to act. If the employee is not aware of the dangerous activity or condition that caused the injury, quote, the most that can be said is that a decision was made by default, which is insufficient to invoke discretionary immunity. And so that's from Andrews. I'm sorry, that's from Monson. Andrews held similarly that a decision requires personal deliberation and judgment. So the exercise of discretion connotes a deliberate choice. So for 2-201 to apply, there must be evidence of a conscious decision and that conscious decision must be made with the conduct alleged to have caused plaintiff's injury. Here, that was failing to stop the student who was displaying repeatedly ongoing and apparent aggressive behavior to step in before he inevitably injured a student. To grant summary judgment on that basis, the evidence that he made a decision must be unrefuted. And as I alluded to before, Mr. Dayhoff's own testimony precludes any conclusion and forecloses the application of Section 2-201 immunity because he made no decision at all. If he didn't see student A's behavior, his failure to stop it could not have been a considered choice. And it isn't because the issue is whether the behavior was going on. There's multiple witnesses that saw the student running into the game, a game he had no business being in. He's not dressed for class, he's not picked for either of the teams, and he had repeatedly run into the game pushing and shoving his teammates. So he made no decision to supervise or what are you trying to say here? I'm saying that he made no decision at all. And so discretionary immunity under Section 2-201 requires at least, at very least, a decision. Usually these discretionary cases involve was a discretionary decision, was it ministerial? Here the analysis is much easier. He didn't make any decision. In defendant's brief, they make the assertion that Mr. Dayhoff exercised discretion when determining whether to intervene in the soccer game in light of the student's conduct. But if you look closely, that assertion is not supported by a citation to the record. And that's not an oversight. The rest of the brief is well cited. If there was evidence that Mr. Dayhoff saw what was going on and chose not to intervene because of whatever reason, it would have been cited. There's no evidence of what decision-making process he used, what considerations he weighed, what balance he tried to strike, or why he might have believed it was best to proceed by allowing an aggressive and disruptive student to continue being aggressive and disruptive. So the point is, without evidence of a decision, defendant cannot meet their burden to establish that discretionary immunity applies. It's similar in all these cases. In Monson, the city didn't know about deviations in the sidewalk that caused the plaintiff to fall, so they couldn't have exercised discretion to fix it. Andrews, it was a ladder. They weren't aware of the two ladder set up on a construction site, so they couldn't have made a decision with respect to whether that was safe or not. In Reyes, the municipal- So that invoked their immunity, is that right? No, no. In Andrews and Monson, discretionary immunity didn't apply because there was no decision. And the same here. Just like not being aware of a missing sign, so not being able to exercise discretion with respect to replacing it, Mr. Dayhoff didn't know this ongoing behavior was going on, so he couldn't have made a decision not to stop it. His inaction wasn't the product of a choice. It was simply because he didn't know what was going on. That's not what discretionary immunity is intended to protect. As the Andrews court noted, the policy reasons for granting immunity are furthered only when the government entity or its employee has engaged in actual decision-making. Here, there's no evidence of actual decision-making, so 2-201 applies. But that's not the only reason 2-201 doesn't apply. The other reason is that where there are two statutory provisions, one of which is general and designed to apply to cases generally, and the other is particular and relates only to one subject, the particular provision prevails. Section 2-201 is general, and the repellent courts have recognized it's a more general immunity. Section 3-108 is specific and concerns a specific type of conduct, the conduct at issue in this case, supervision. In Murray, the Supreme Court applied this principle and found that the specific immunity provision for hazardous recreational activities, Section 3-109 of the Act applied over the more general provision for discretionary immunity. The defendants attempted to distinguish Murray on the basis that involved a different section of the Act, but for one, I would draw the court's attention to the structure and the organization of the Act itself. Section 2-201 is contained in Article 2 of the Act, which is entitled General Provisions Relating to Immunity. Section 3-108 of the Act is contained in the subsequent section, the same Section 3-109 at issue in Murray is in, which is entitled Immunity from Liability for Injury Occurring on the Use of Public Property. Mr. Anderson, thank you. Is there a dispute as to once the injury happened, whether or not Dayhoff took the child immediately to the office? Is there a dispute as to whether he went, whether Dayhoff was immediately there and took him? I don't necessarily believe it's in dispute. There's no evidence that he took him and I don't believe Mr. Dayhoff indicated that he did. The reason that plaintiffs cited that evidence is because there's case law that indicates evidence of a defendant's state of mind can be indicative of willful and wanton conduct, conscious disregard or utter indifference. And the case law is that even post-accident conduct can be indicative of that state of mind. So the purpose of us citing the reference to Mr. Dayhoff not helping Riley after the accident is to indicate his willful and wanton state of mind, his indifference to this entire situation, which underscores his behavior leading up to the occurrence. So that's the purpose for that evidence. But no, there's no dispute as to once the injury happened, whether Mr. Dayhoff took him to the emergency room or took him to the nurse or school nurse or something like that. Okay. Dayhoff and the principal both said he was taken to the office, but Riley said he was not. Is that a fair recitation of the facts? That's a fair recitation of the facts, but I believe the testimony was that by the time he was taken to the office, it was after Mr. Dayhoff's class period had ended. I may be mistaken on that. And if I am, I apologize, but that was the purpose of the evidence was just another indication of Mr. Dayhoff's state of mind at the time. So I hope that that answers your question. That's fine. Here, the court has recognized that our courts have recognized that teachers have a duty to supervise their students. Defendant recognized that they have a duty to supervise students. Mr. Dayhoff admitted it was his role to supervise students. Plaintiff's complaint, the allegations are supervised. This is a supervision case. The gravamen of the case is Mr. Dayhoff's failure to supervise during that class period. Those allegations fall under the specific provisions of 3-108. So 3-108 applies in this case and 2-201 does not. And unlike section 2-201, 3-108 does not provide absolute immunity for wrongful supervision. It does not immunize willful and wanton failures of supervision. Moreover, whether conduct is willful and wanton is a question of fact for the jury. And only in the exceptional case should that issue be taken from the jury's consideration. Now the defendant contends that Mr. Dayhoff had no knowledge of impending danger, but that too is a question of fact. Whether a defendant knew or should have known of an impending danger is a question of fact that can't be decided as a matter of law. So whether Mr. Dayhoff knew or should have known that this kid was an ongoing and apparent danger to his classmates before of an injury, that in and of itself is a question of fact that precludes summary judgment. Moreover, his lack of knowledge was of his own making. He's using his own abrogation of his duty to supervise as the reason he had no knowledge. That's not the purpose of discretionary immunity. That embodies the concept of utter indifference. In our brief, we defined utter indifference. It's a lack of interest or concern. It's difficult to conceive of a more apt description of Mr. Dayhoff's conduct. This isn't merely a situation where his attention was distracted elsewhere. He was helping another teacher. He was distracted by another student. Construing the evidence in the light most favorable to the plaintiff, Mr. Dayhoff was sitting in the corner with his feet up, playing with his phone and his tablets while his students did whatever. His conduct embodies the concept of utter indifference and the issue of willful and wanton conduct should not be decided as a matter of law. As the first district recently discussed in Davis, willful and wanton cases generally fall into one of three categories. One extreme are cases so benign as to clearly be a matter of law below the theoretical minimum for willful and wanton conduct. The other extreme are cases so egregious where one could say as a matter of law that the employee acted willfully and wantonly. The third scenario are circumstances where the where reasonable minds can draw different inferences from the same undisputed facts, it's the role of the jury to decide whether the conduct at issue has crossed the line and become willful and wanton. Here, the circumstances are certainly not so benign for the issue of willful and wanton conduct to be determined in defendant's favor as a matter of law at the summary judgment stage. Therefore, the plaintiff asks this court to reverse the decision of the trial court and the case back to the circuit court for further proceedings. Thank you, your honors. Questions from the court for Mr. Anderson? None further. Thank you, counsel. Thank you. Ms. Walsh, you may respond. Good morning, everyone. Thank you. I may please the court. So the facts in this case are really simple and undisputed. Riley was injured during gym class when another student, student A, who had no previous conflict with, had come in contact with him during a soccer match. Now, plaintiff seeks to hold the district and the gym teacher, Mr. Dayhoff, liable, alleging that Mr. Dayhoff was willful and wanton in the supervision of the class, and the district was willful and wanton in not implementing the appropriate discipline and interventions for student A or otherwise protecting Riley. Both of these claims fall squarely within section 2-201 of the Tort Immunity Act, which immunizes both the district and the challenge discretionary policy decisions, regardless of whether willful and wanton conduct is found. Now, applied to Mr. Dayhoff, his decision to implement a recreational day, how best to facilitate and supervise the activities, and whether to intervene in the soccer game were discretionary policy decisions because they required him to balance competing interests and make a judgment call. This is supported both by Illinois case law, finding that teachers have wide discretion in how to conduct their class, and the undisputed facts, mainly that on the day of the incident, Dayhoff had discretion to determine the activity of the day and directed half the class to play soccer, the other half to play basketball. He purposely chose to position himself in the southeast corner of the gym because it was his opinion that was the best location to observe all of the students, so he wouldn't have to be turning his head to observe all the three different activities, the basketball, the soccer, and the students who were sitting out. Counsel, directing your point to the student that was sitting out, student A, there was a conscious decision then knowing his background to allow him to participate by jumping in and out of this soccer game? So that was my next point. He affirmatively permitted student A to participate in the class, even though he didn't dress. He allowed all the students who didn't dress for the class to participate in either the basketball or the soccer games, and student A decided to play soccer. Mr. Dayhoff indicated that he observed student A playing soccer, quote, just like the rest of them, and shortly before the incident, he observed three or four boys battling for the ball, including student A and Riley, but determined that to be, quote, the normal scrum for the ball and nothing out of the ordinary beyond trying to get the ball. It's undisputed that Dayhoff had the authority and discretion to remove a student from a game or issue a referral if he deemed it was necessary, and he stated he did not see student A engage in aggressive or unwanted physical contact with another student during the soccer match to warrant intervention. Therefore, contrary to plaintiff's assertions, Dayhoff's testimony was that he didn't observe anything. He simply didn't observe any behavior to warrant intervention or I want to clarify, we did include the citation to that in our brief. Yes, I'm sorry. Yeah, thank you. Is the evidence that he basically blew a whistle and let him all proceed on all of these activities and spent the rest of his time watching during screen time? So, no. So, the testimony is they lined up, he took attendance, he told everyone to run laps, and then he decided to implement a recreational day because it was between curriculums. So, it was a free day specific to soccer or basketball, and he put balls down. He then indicated that he walked over to the southeast corner of the gym because, in his opinion, he would be able to see everyone. And he also indicated that he went to half court to monitor as well. And I want to be clear on this. Plaintiff makes a big deal about sweeping assertions that DeHoff was preoccupied by his phones or screens the entire time. And this actually is not disputed in the record. Riley saw Mr. DeHoff open his computer but didn't see him typing. Jacob saw DeHoff open his laptop maybe once or twice because his attention was focused on the game. He later said in his deposition he only saw him once while he was playing soccer, and the second time was when he approached him after Riley had been injured. And Riley recalls DeHoff had his phone, but he doesn't know if he had been texting, and he doesn't know if it was more than twice. And Jacob didn't recall Mr. DeHoff on his phone during the incident. So, even viewing these facts in light most favorable to plaintiff, the testimony provides that Riley and Jacob only glanced over to Mr. DeHoff once or twice during the game and stated they were more focused on the game. And plaintiff's vague and general statement about DeHoff's custom and practice to sit in the corner during the recreational days doesn't actually create a disputed issue of fact because it's a testimony on the day in question that's relevant. And both testified they didn't know what, if anything, DeHoff was doing on his device. And DeHoff's testimony was that any activity on his computer or phone would have been school-related, such as responding to an email. So, that's not actually a dispute. But regardless... Counsel, you're saying then that his desk, he positioned his desk so that he could see both sides without having to turn his head, correct? Correct. But that's where his desk was all the time, correct? He and... I don't know. I don't believe that that's in the record. Both Riley and Jacob testified that his desk, he went over to his desk frequently on recreational days. And I want to specify that anytime they talked about habit and routine, it was on recreational days, not during the actual curriculum. And so, I don't believe they specified the desk. But DeHoff's testimony indicated that he chose that corner so he wouldn't have to turn his head to move and he'd be able to... Everyone would be in front of him and he'd be able to see all the activities. He also indicated that he walked to half court and behind the basketball area because most students were playing basketball. So, he wanted to observe that activity. But regardless, these decisions in terms of where to place, where to supervise the students and his decision to occasionally glance at his work device while supervising qualifies as a discretionary policy decision protected under 2-01. Like every teacher, DeHoff had a balance bearing competing interests with this time and make judgment calls as to how best to perform his teaching responsibilities. Would you agree that DeHoff knew or didn't know that student A was physically disruptive or physically aggressive? Mr. DeHoff indicated that he saw him playing soccer like the rest of the students. No, I mean history, historically, that he had an issue with being physically aggressive, that there had been prior referrals. Did DeHoff admit that he knew that or did he deny that? DeHoff indicated that he had never issued a referral to student A, that he had never seen student A engage in any conduct that was, quote unquote, serious. The testimony is that student A's disciplinary record was included on the Skyward system that every teacher had access to. However, DeHoff was supervising six different class periods, so he had well over 100 students, and there was no duty or obligation to constantly refer to that Skyward system. Both the assistant principal, Walt, and student A's guiding counselor, Linfield, both indicated that they never sent out specific notifications regarding student A, other than to say he had a habit of wandering around. Both indicated that they did not deem him to be an aggressive student and never gave any sort of notification to anyone that he was an aggressive student. Well, I think it's clear that DeHoff said that he didn't see these things, but what about the responsibility of the dean's office for letting DeHoff know that this was someone to keep an eye on, as is argued? Right, so that's our second point, and I don't need to belabor it because it doesn't appear to be contested, but to the extent that plaintiff is arguing that District Judge DeHoff should have known the incident would occur, or that they should have implemented increased supervision of student A based on his prior disciplinary record, the Illinois appellate courts have consistently held that determining and implementing appropriate discipline and interventions for a student and the dissemination of that information or discretionary policy decisions that fall within the scope of 2-201, and as applied here, the facts show that the district did investigate student A's referrals, they implemented discipline, as well as various remedial measures, they determined student A was not physically aggressive and did not need heightened supervision, and they determined that teachers did not need to be informed of any disciplinary interventions of student A beyond being noticed of his wandering. So it's for these reasons that summary judgment is appropriate, because as a matter of law, the defendants are fully immunized under Section 2-201, regardless of any finding of 2-201 conduct. Because they testified that they did exercise discretion at that time, they made a decision, that's in the record? Absolutely, absolutely, there is a long record of the interventions that were implemented towards student A. Communicating the knowledge is what I'm talking about. I'm sorry, what was the question? Communicating the knowledge to the other, they didn't get warranted putting an alert out about this particular student. Correct, because they didn't find him to be physically aggressive based on their investigation of the referrals and their meetings with them, and the implementation, the remedial measures that they put in, the check-in and check-out system, things of that nature, they did not give any notice to the teachers and didn't feel like there needed to be any notice. And Principal Waltz indicated this is assessed on a case-by-case basis, and both her and Linfield both testified that they did not feel a need to, and did not send out any notice to teachers other than to put him on notice that he has a habit of wandering hallways. Counsel, during that school year, we're talking about the 2016-2017 school year, there were 17 referrals for insubordination, three for physical aggression, fighting four, profanity, verbal abuse, theft, etc. Is that your understanding of the facts? Correct, so he was referred 20 times for cutting class and being in an unauthorized area or in subordination, and he was disciplined for 13 of those times. He was referred three times for physical touching. It could have just been standing in a manner that could be interpreted as being uncomfortable with body language. And how about for the fighting, the four instances for fighting, how was he reprimanded for that? He was issued discipline four times for fighting. However, five of the seven of those occurred at the first half of the year, and they didn't identify student A as being the instigator. The guidance counselor indicated that student A was often the target of these fights because he had a low socio IQ and just didn't handle middle school kids. They tend to provoke and whatnot, and because of that, he tended to be the target of these fights. He was not recognized as an instigator of these fights, rather someone that was more often the target. And the records, the deposition testimony indicate that. And both Linfield, the guidance counselor, and the assistant principal, and the principal, who were all working with them during this, took that into account, interviewed the teachers who were giving the referrals, and based on all that information, determined that he didn't need a behavioral plan. He didn't need to be deemed an aggressive student in any way. And the remedial measures that they implemented were, in their mind, sufficient. What time during the class period did this incident occur? How long into it? It occurred towards the end of the class period, based on the testimony. And that's, I wanted to bring up, whether or not to go to the office. Dayhoff's testimony was, oh, when he learned of it, he said, okay, according to Riley, he said to go sit on the bleachers because there was only five or ten minutes left. Dayhoff's testimony was that he sent him to the office. Either way, he ended up going to the office afterwards and indicated that it was an accident that occurred. And I also want to point out that, in terms of student A, he had no previous interactions at all with Riley. There were no instances of any conflict or any interactions with Riley prior to this. And so, with regard to Willful and Wanton, well, I just want to pull up the fact that 3-108, we think it applies, but we don't think it excludes 2-201, because they are each within their own spheres, and they address different matters. So here, the failure to supervise is protected by 3-108, and decisions related to class activity, the implementation of that activity, what safety measures to take, and what discipline or remedial measures to take, if any, come within 2-201. And with regard to Willful and Wanton conduct, courts have been very clear that an injury caused by an intentional, unprovoked act of another student, neither the defendant have a duty to anticipate or prevent that injury. And again, Riley had, in student A, had no previous conflicts. The two students' moments of tension towards Dayhoff during the game are not enough to show that Dayhoff was being Willful and Wanton in his supervision. But even if the court found that he failed to adequately supervise his class, because he was looking at his, quote-unquote, screens, this isn't sufficient to claim Willful and Wanton conduct. Courts have repeatedly held that the breach of a duty to supervise students in a school setting does not, as a matter of law, rise the level of Willful and Wanton conduct. And this is the case even when a student with alleged dangerous propensities or violent behavior is present, even when the failure to supervise has been for long stretches of time, including up to 30 minutes, even when supervising sports activities. General allegations that a teacher or school should have known harm would occur without adult supervision is inefficient as a matter of law. And that is essentially what plaintiff is claiming. Instead, you have to show that Dayhoff for the district knew that a lack of supervision posed a high probability of serious harm. And that is simply because there's a risk of injury, especially in gym class, especially with middle school boys, that's always going to occur. It requires knowledge of a high probability of serious harm or specific foreseeable probable harm. And here, allegations of general aggressiveness with a student. Can I finish? Thank you. You will. Are there any questions from the court? No further. No. Okay. Thank you, Miss Walsh. Mr. Anderson, you may reply. You're muted. You're muted. I knew I was going to do that. Thank you, your honors. A lot of what we just heard in that argument is essentially asking this court to interpret the facts and the evidence in the light most favorable to the defendant. And that's not permissible at the procedural posture of this case where we're at. Under the standard for summary judgment, which includes the pedigree standard, all of these facts, all of the evidence must be interpreted in the light most favorable to the plaintiff. All of the inferences can't be drawn in defendant's favor. They've got to be drawn in plaintiff's favor. Defendant attempts to commission that he didn't see this ongoing behavior by saying his Mr. Dayhoff's testimony is only that he did not see anything out of the ordinary, implying that he was looking and there just wasn't any of this behavior ongoing. But the facts that need to be interpreted in the light most favorable to the plaintiff include Riley and Jacob's testimony that this behavior was repeated and ongoing throughout class, that this kid was going throughout class, was going into the game, and was not part of either team and was shoving and pushing students. Mr. Dayhoff ignored a known danger, an obvious danger that was going on in his midst. That is the inference that has to be drawn at this particular stage on summary judgment. The defendant also accused the plaintiff of making sweeping accusations that the defendant wasn't paying attention. Mr. Anderson? Yes, your honor. You used the word ignored. Is that the proper word? Ignored? He ignored? He ignored his responsibilities to provide his students. Oh, okay. Boy, there must be something wrong with the system. I keep talking and you do at the same time. Ignored would be aware of something, correct? You have to have to ignore something, you have to be aware of, and what was what was he aware of that he ignored? He was aware of his obligation to... I'm sorry, he was aware of his obligation to supervise this student, and the... I thought you were using it in terms of he ignored this in and out behavior of student A. No, no, that's the issue is he didn't see it. He didn't know to ignore it because he was he was staring at his... I heard it the other way, that's why I asked the question. I apologize. Yeah, actual knowledge of the danger is not necessarily required to show that an omission is willful and wanton. It can be committed under circumstances exhibiting recklessness or a conscious disregard or utter indifference after knowledge... I'm sorry? For a known risk, correct? Correct, or the failure to discover through recklessness or carelessness when it could have been discovered through ordinary care. So we can't say my conduct was so egregiously bad that I didn't know what was going on by my own making because I chose to consume myself with screen time rather than my responsibilities to supervise the class. That's what he was doing, is he ignored a apparent danger, an obvious danger that would have been known to him had he only looked up from his screens. That's the inference... Did everybody freeze? Yep. Judge Holdridge, I can see you. Ms. Walsh is moving. I think... Is Ms. Walsh moving? I don't see her. Yep. Yeah, she can hear us. Justice Davenport, can you hear us? Mr... There you go. We're back. Oh, we're back alive. Oh, did we freeze? Yes, we did. Yes. Oh, I apologize. This was an ongoing and apparent danger that was going on in his midst and had he only looked up from his screens, he would have seen this danger. So he failed to discover the ongoing and apparent danger in his midst by his own doing, because he was so consumed by his screen time, because he abrogated his duties to supervise so much that he wasn't even aware of the risk that he was supposed to stop. His decisions with respect to other things, whether to implement a recreational day, determine the activity that was conducted in class, to direct the half the class to play soccer, those are red herrings. Those are irrelevant. The conduct alleged to have caused the injury is the failure to stop this kid who was apparently and obviously running into this game and hurting his teammates before he caused an injury. And Mr. Dayhoff didn't do that. Your allegation is that he didn't. What you're trying to do is survive summary judgment here. Isn't your argument that's for a jury? Absolutely. Absolutely. Well, I mean, and simplify very much. Yeah. I mean, yeah, I think a jury could reasonably conclude based on you're getting a closing argument to the jury right now. Well, well, I am I see that I'm out of time. Thank you for your time. Are there any questions from the court? No, nothing further. Nothing. Okay. Well, thank you, counsel, both for your arguments in this matter this morning. It will be taken under advisement and a written disposition shall issue.